IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JEFFREY SCOTT TRUITT,

                    Defendant.

CRIMINAL CASE NO.

1:14-CR-00393-AT-JFK-1

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Jeffrey Scott Truitt's motion [Doc. 17] to suppress evidence obtained as the result of the execution of a federal search warrant, signed on October 14, 2014, for his residence located at 4406 Arcadia Drive, N.W., Norcross, Georgia 30093. [Id., Attachment 1, Search Warrant Application]. In support of the motion to suppress, Defendant contends that (1) he is entitled to a Franks hearing[1] because the affiant for the search warrant deliberately or with reckless disregard for the truth included misleading information in the application and omitted material information from the application; (2) probable cause is lacking because the application depends on stale information; and (3) probable cause is lacking because

---

[1] See Franks v. Delaware, 98 S. Ct. 2674 (1978).

AO 72A
(Rev.8/82)

of the inclusion of irrelevant information that fails to provide a nexus between the evidence being sought and his residence. [Doc. 17 at 12-21]. The Government opposes the motion to dismiss contending that Defendant has not made a sufficient showing to entitle him to a <u>Franks</u> hearing and that the Application does provide probable cause for the search. [Doc. 19]. And Defendant filed a reply in support of the motion to suppress. [Doc. 31]. After consideration of the arguments, of relevant legal authority, and of the Search Warrant Application, the court recommends that the motion to suppress be denied.

## I. Search Warrant Application

The Search Warrant Application ("Application") seeks evidence, contraband, illegally possessed items and the like concerning violations of 18 U.S.C. S§ 922(j), (o) and (u) and of 26 U.S.C. §§ 5841, 5845(f) and 5861(d).[2]  In support of the search

---

[2]Section 922 makes it a crime and states in pertinent part:

(j)     It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition . . . which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

(o)     [I]t shall be unlawful for any person to transfer or possess a machinegun[, except for circumstances not applicable herein].

warrant for 4406 Arcadia Drive, N.W., Norcross, Georgia 30093 and the premises, including outbuildings and vehicles located thereon, Special Agent Spence Burnett, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), hereinafter Affiant, provided an affidavit for consideration by Magistrate Judge Russell Vineyard. (Application). The following facts are deemed pertinent to the <u>Franks</u> challenge to the search warrant and to whether the Application establishes probable cause.

Affiant has been a Special Agent with ATF since February 2011 and previously served, since 2006, with the U.S. Air Force Office of Special Investigations and had received training both with the ATF and Air Force to perform his law enforcement duties. (Application ¶ 1). The Affiant outlined the investigative background of the case beginning with the results of a May 5, 2014, state search warrant executed in

---

(u)     It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of . . . dealing in firearms, any firearms in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.

18 U.S.C. §§ 922 (j), (o) and (u).  Section 5841 provides information regarding the registration of firearms.  Section 5845(f) provides the definition of a destructive device which is included within the definition of a firearm, <u>see</u> 26 U.S.C. § 5845(a). And Section 5861 of Title 26 outlines the acts prohibited, in pertinent part:  "It shall be unlawful for any person- . . . (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record[.]"

3

Atlanta, Georgia, and the recovery of fourteen firearms and a trafficking amount of methamphetamine.  The recovered firearms were submitted to the ATF's National Tracing Center,[3] and five of the seized weapons were traced to Mainstreet Guns and Range ("Mainstreet Guns") located in Lilburn, Georgia.  (Id. ¶¶ 6-7).  When questioned about the firearms, Mainstreet Guns advised that four of the guns should have been in the store's inventory and that the fifth firearm, a Desert Eagle model .45 caliber pistol, manufactured by Isreali Weapon Industries ("IWI Products pistol"), bearing serial number 43358142, was sold to Defendant Truitt, with the address noted *supra*, on December 6, 2013, 150 days before being recovered by law enforcement. (Id. ¶¶ 7-8).

Affiant then explained ATF's terminology, "Time to Crime," which is the difference between the purchase date of a firearm and the date law enforcement recover a firearm.  Affiant outlined his training with ATF regarding the purchase of firearms by firearm enthusiasts who view purchases as an investment, conduct research before making a purchase, and "generally retain these firearms for longer periods of time." (Id. ¶ 8).  Such firearm owners are law abiding citizens and firearms

---

[3]Affiant, based on his experience and training, described the National Tracing Center and how the tracing process operated.  (Id. ¶ 5.A.-B.).

owned by them "are rarely recovered by law enforcement agencies shortly after" being purchased new from a Federal Firearms Licensee ("FFL"). (Id.). Based on Affiant's Advanced Firearms Trafficking Course and interviews with firearm owners and FFLs, Affiant is aware that a short "Time to Crime" is "repeatedly indicative of illicit firearms purchases and sales" and that such a time period of less than 730 days "is considered a strong indicator of potential criminal activity." (Id.).

On May 8, 2014, associated with the search on May 5, 2014, another firearm was recovered and traced to Mainstreet Guns. The store determined that the firearm, along with the four other firearms seized on May 5, 2014, were stolen from its inventory. (Id. ¶¶ 9-10). Additionally, Mainstreet Guns reported stolen a Walther P99, 9mm pistol, bearing serial number FAH6446. (Id. ¶ 10). Affiant requested an ATF trace for transactions related to Defendant and discovered that (1) on August 16, 1998, New Orleans Police Department recovered a Beretta pistol previously purchased by Defendant on May 17, 1995, in Athens, Georgia, generating a "Time to Crime" of 1187 days; (2) on January 29, 2007, New Orleans Police Department recovered a Glock pistol previously purchased by Defendant on December 30, 1992, generating a "Time to Crime" of 5143 days; and (3) on November 28, 2009, Roswell Police Department recovered a Mossberg 12 gauge shotgun previously purchased by

5

Defendant on March 10, 2000, generating a "Time to Crime" of 3550 days.  None of these firearms were reported stolen.  (Id. ¶¶ 11).  Referencing the training and experience set forth *supra*, Affiant stated the "prior traces of firearms linked to a single purchaser are an indicator of illegal firearms trafficking." (Id. ¶ 12).  In order to prevent residential burglary theft of firearms, which are often subsequently recovered by law enforcement, firearms collectors invest in safes and other devices to limit such thefts.  Affiant stated, "Based upon all of these facts, it is exceedingly rare for an individual who has not suffered a residential burglary to have four separate firearms that they purchased recovered by law enforcement agencies in four separate events . . . ." (Id.).

Affiant then provided information concerning Mainstreet Guns conducting a complete inventory and discovering seven empty firearm boxes, found in the employee only area of the store or areas inaccessible to customers, for some of the missing firearms and for several missing long guns.  Other firearms were determined to be missing along with the packaging.  As of June 30, 2014, a total of 54 firearms were missing from inventory, including 48 rifles, pistols or shotguns and one .22 caliber suppressor. (Id. ¶ 13).  And Mainstreet Guns had previously, on September 18, 2013, reported three missing suppressors, two for a .22 caliber firearm and one for a

6

9mm firearm.  Suppressors, designated a firearm by statute, are required to be registered.  (Id. ¶¶ 13-14 & n.3).  Most of the missing firearms were expensive, high-end guns indicating a potential market for the guns.  (Id. ¶ 14).  And, based on an examination of the list of firearms missing from Mainstreet Guns, Affiant reported that an ATF interstate nexus expert opined that "all of the missing firearms traveled in or affected interstate or foreign commerce."  (Id. 16).

On July 11, 2014, Affiant and other ATF agents spoke to the owners of Mainstreet Guns, Jim and Jenny Hornsby, who advised that Defendant had been an employee since October 2012.[4]  (Id. ¶ 17).  Because she handles ATF trace requests, Jenny Hornsby had discussed with Defendant the "IWI Products .45 caliber pistol" which Defendant had purchased in December 2013 and which was recovered by law enforcement in May 2014.  (Id.).  Defendant advised her that he suspected that a family member had stolen the firearm out of his vehicle.  (Id.).  On July 14, 2014, Affiant and other ATF agents spoke to Defendant at Mainstreet Guns, asking him "an open-ended question about the firearm that had been traced to him . . . not referencing a specific type of firearm . . . ."  Defendant responded "that his nephew or his nephew's friend had stolen a Walther pistol, which Defendant had purchased from

---

[4]Defendant was fired in July 2014 for an unrelated incident.  (Id. ¶ 32).

Mainstreet Guns, and a 12 gauge Binelli shotgun from the trunk of his car." (Id. ¶ 18). His nephew, Tyler Truitt, and the friend had been playing pool at a bar with Defendant in Gwinnett County, in approximately February or March of 2014, and Defendant discovered the firearms stolen from his trunk; however, Defendant did not report the firearms stolen because he did not want to get his nephew, who had just been released from custody and used drugs, in trouble. (Id.). Defendant stated that he had never had any other firearms stolen from either his residence or vehicle and that the only theft or burglary he ever had involved a few items stolen from his garage. (Id. ¶ 19).

Affiant reviewed Mainstreet Guns' records regarding the Walther pistol Defendant discussed and found out that Defendant purchased the firearm on September 16, 2013, and sold the firearm back to Mainstreet Guns on October 10, 2013. (Id. ¶ 20). The firearm was then stolen from Mainstreet Guns before May 23, 2014, the date the theft was reported to the ATF. On June 2, 2014, the firearm was seized by Penitas, Texas, Police Department from a juvenile arrested for DUI, making the "Time to Crime" (calculated from when Defendant sold the firearm back to Mainstreet Guns) 235 days. (Id.).

Affiant also determined that Tyler Truitt was in Gwinnett County custody from November 14, 2013, to April 4, 2014, while Defendant claimed the firearms were

8

stolen by his nephew and a friend.  (Id. ¶ 22).  And on August 18, 2014, Affiant, along with other ATF agents, interviewed Tyler Truitt who stated that he had never played pool with Defendant nor introduced any of his friends to Defendant.  (Id. ¶ 23).  He also advised that he had not seen Defendant since August or September of 2013 when he was at Defendant's residence, where Defendant lived alone.  Defendant showed him several firearms, including two .22 caliber pistols with suppressors attached to each and several AR rifle variants and other associated firearms and parts in the residence and a shotgun that had a pistol grip and was painted in camouflage in the trunk of Defendant's vehicle.  (Id. ¶ 24).  He also observed on the coffee table a 12 gauge shotgun shell attached to a homemade trip wire and mousetrap device which Defendant said could be rigged as a booby trap but was not set up yet.  (Id.).

On September 24, 2014, Affiant, along with other ATF agents, interviewed Jack Dodson, a former employee of Mainstreet Guns, who was fired in February 2014, for selling a holster and keeping the proceeds, and Dodson admitted to agents lying to James Hornsby about the incident.  (Id. ¶ 26).  Dodson was also questioned by Lilburn police when the first five firearms, those seized in May 2014, were reported stolen by Mainstreet Guns.  (Id.).  Dodson, who has never been to Defendant's residence, stated that in July or August 2013, Defendant advised that he had "several 'illegal' weapons,

9

including AR variant rifles that were capable of firing on 'burst.'"  (Id. ¶¶ 27-28).
Defendant also stated that he had homemade explosive devices, "claymores," made
with 12 gauge shotgun shells and rat traps that "were rigged to his doors so that
anyone who triggered the device would be injured."  (Id. ¶ 27).  And Defendant
"bragged that he had several short barreled rifles (SBR's) with suppressors attached
to them."  (Id.).  Defendant also advised Dodson "that he was addicted to heroin . . .
."  (Id. ¶ 28).  In December 2013 or January 2014, Dodson observed Defendant at the
Mainstreet Guns' shooting range with a Walther P22 pistol with a suppressor which
Dodson thought belonged to Defendant.  (Id. ¶ 30).  Affiant stated that the description
of this firearm matched a firearm Tyler Truitt had seen in Defendant's residence.
Mainstreet Guns, on June 30, 2014, reported a Walther P22 missing along with a .22
caliber suppressor and, on September 13, 2013, reported as stolen two .22 caliber
suppressors - the suppressors could be affixed to a Walther P22.  (Id.).

On May 9, 2014, Defendant purchased several firearms from Mainstreet Guns
including a FNH SCAR 17s rifle for $2,650, which he paid for in cash allegedly from
a large bonus check received from UPS.  Defendant had advised individuals at
Mainstreet Guns he had a second job at UPS; however, Defendant only worked for
UPS as a delivery driver from October 12, 2012, to December 6, 2012, when he was

terminated.  (Id. ¶ 31).  Defendant was paid $8.50 per hour in cash for his work at Mainstreet Guns.  (Id.).  Defendant's state income tax returns showed a federal adjusted gross income in 2012 of $10,555 and in 2013 of $9,128.  (Id. ¶ 33).  Affiant stated that, based on his training and experience, straw purchasers may take orders or requests from others who cannot legally purchase firearms and that the straw purchasers usually receive payment for making the purchase - income that is rarely reported on tax returns.  (Id. ¶ 34).

In August 2014, Affiant conducted an inquiry to determine if Defendant had any legally registered firearms, such as destructive devices, machineguns, short barreled rifles or shotguns or suppressors, and no such records were found.  (Id. ¶ 35).  Affiant also consulted with an ATF Explosives Enforcement Officer, who is also a certified U.S. Navy Explosives Ordinance Disposal technician, regarding the legality and classification of tripwire devices similar to those described in Defendant's possession by Tyler Truitt and Dodson.  Affiant was advised that "as long as they are loaded with shotgun primers designed only to produce a sound but not propel a projectile[,]" the devices are legal; however, "[o]nce loaded with a live shotgun shell, the devices are classified as destructive devices . . . which must be registered . . . ."  (Id. ¶ 36).

11

Affiant finally recounted, based on his training and experience, and that of other law enforcement officers with whom he works, information regarding firearms ownership, custody and possession. (Id. ¶ 37). Affiant stated "that most people store their firearms in their homes" or motor vehicles or on their persons and "that those who own and possess firearms and ammunition generally maintain possession of them for a long period of time." (Id.). He also stated that "firearms do not easily wear out[,] . . . are like expensive tools that their owners keep and maintain over a long period of time[,] . . . [and] must be maintained in an environment where they will be secure from theft, rust and corrosion." (Id.). Affiant further stated that "almost without exception individuals who possess firearms" also possess related items, including, paperwork relating to the purchase, gun cases, ammunition and packaging materials. (Id.).

Additional facts will be set forth as necessary during discussion of the motion to suppress.

## II.    Discussion

### a.    **Franks** Hearing

Defendant first contends that due to the inclusion of materially false information in the affidavit and the omission of material information from the affidavit, which was

12

"surely known to the agent at the time he penned the affidavit" to be so, he is entitled to a <u>Franks</u> hearing.   [Doc. 17 at 12-16].   Defendant points to two pieces of information in the affidavit that he asserts are false.   First, Affiant's statement that Dodson told him that Defendant had "described homemade 'claymores' that were built with 12 gauge shotgun shells and rat traps and were rigged to his doors so that anyone who triggered the device would be injured" allegedly falsely includes the last part about the devices being rigged to his doors.   Defendant asserts that nowhere in Dodson's recorded statement does he attribute to Defendant a statement that the claymore was rigged to his door or otherwise set up to injure anyone.   [<u>Id.</u> at 12-13, citing Application ¶ 27].   Second, Affiant allegedly misrepresented Dodson's statement regarding Defendant's comments about drug use, that is, Affiant said Defendant told Dodson that he was addicted to heroin when Dodson only reported that Defendant said he used heroin and that Dodson stated that he was not sure if Defendant was joking about the heroin.   [<u>Id.</u> at 13, citing Application ¶ 27].   And Defendant points out two allegedly material omissions from the Application.   First, Affiant's recounting of Defendant's admission to Dodson that he had several "illegal" weapons, including the AR variant rifles, capable of firing on "burst," failed to include Dodson also advising that Defendant had told him that the AR variant rifles belonged

13

to his brother.  [Id. at 13, citing Application ¶ 27].  And, second, that Affiant failed to include in the Application that several employees of Mainstreet Guns identified Dodson as the person most likely to have stolen the firearms from Mainstreet, due in part to his having been fired.  [Id., citing Application ¶ 12].

In Franks, 98 S. Ct. 2674, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  Franks, 98 S. Ct. at 2684-85; see also United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009).  "[T]o prevail in a Franks challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant."  O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (citation omitted).

14

And Franks is applicable to information omitted from an affidavit for a search warrant.  "[A] warrant affidavit violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'"  Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (citation omitted).  "A party need not show by direct evidence that the affiant makes an omission recklessly.  Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.'"  Id. at 1327 (citation omitted); accord United States v. Owden, 345 Fed. Appx. 448, 454 (11th Cir. 2009) (same). "Omissions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . .   Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."  Madiwale, 117 F.3d at 1327; accord United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009) ("The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would have been lacking.'") (citation omitted).  No Franks hearing is required, if, when the omitted information is added to the affidavit, the affidavit's content still establishes probable cause for the search.  Kapordelis, 569 F.3d at 1309; Owden, 345 Fed. Appx.

15

at 454 (if the challenge is based on information omitted from the affidavit, then the

showing must be that the "'omission was essential to the finding of probable cause'")

(quoting United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006)).

Accordingly, to mandate a Franks evidentiary hearing,

> the [defendant's] attack must be more than conclusory and must be
> supported by more than a mere desire to cross-examine. There must be
> allegations of deliberate falsehood or of reckless disregard for the truth,
> and those allegations must be accompanied by an offer of proof. They
> should point out specifically the portion of the warrant affidavit that is
> claimed to be false; and they should be accompanied by a statement of
> supporting reasons. Affidavits or sworn or otherwise reliable statements
> of witnesses should be furnished, or their absence satisfactorily
> explained. Allegations of negligence or innocent mistake are
> insufficient. The deliberate falsity or reckless disregard whose
> impeachment is permitted . . . is only that of the affiant, not of any
> nongovernmental informant. Finally, if these requirements are met, and
> if, when material that is the subject of the alleged falsity or reckless
> disregard is set to one side, there remains sufficient content in the
> warrant affidavit to support a finding of probable cause, no hearing is
> required. On the other hand, if the remaining content is insufficient, the
> defendant is entitled, under the Fourth and Fourteenth Amendments, to
> his hearing. Whether he will prevail at that hearing is, of course, another
> issue.

Franks, 98 S. Ct. at 2684-85. The court, when applying this standard to Defendant's

request for a Franks hearing, finds that Defendant has not made a substantial

preliminary showing undermining the probable cause otherwise set forth in the

Application as necessary for a hearing to be held.

16

Defendant, as noted, contends that Affiant included two material misrepresentations in the Application: (1) that the claymore mines were rigged to his doors to injure anyone entering and (2) that Defendant was addicted to heroin. The Government does not argue, in response, that Dodson's recorded statement does include these statements but, instead, argues that when considering the context of the conversation with Defendant that Dodson recounted, Affiant properly *inferred* that the mines were rigged and that Defendant was addicted to the drug. [Doc. 19 at 4-5]. Defendant correctly points out that Affiant did not advise the Magistrate Judge that he was inferring from Dodson's recounting of his conversation with Defendant that the mines were rigged and that Defendant was addicted not just, if not joking, using heroin. [Doc. 31 at 1-2]. Although the court would counsel Affiant against making this type of inference from a witness' statement, especially, when he could have easily fully recounted the conversation for Magistrate Judge Vineyard in order for the judge to draw any reasonable inferences from the facts, see United States v. Parker, 2010 WL 5313758, at *12 (N.D. Ga. November 18, 2010), adopted by 2010 WL 5313449 (N.D. Ga. December 17, 2010), the Government is correct that, even if the court concluded that these two statements were false and either deliberately or with reckless disregard included in the Application, the statements were not material to the finding

17

of probable cause.  As will be discussed in more detail below, removal of the phrase that the claymore mines "were rigged to his doors so that anyone who triggered the device would be injured" (Id. ¶ 27) and, frankly, deletion of any reference to Defendant's use of heroin will not negate a finding of probable cause.  The same is true with respect to the two omissions from the Application, that is, inclusion of the information that the AR variant firearms in Defendant's possession belonged to his brother and that Mainstreet Guns' employees believed Dodson was responsible for the theft of the firearms would not negate probable cause.

With respect to the omissions, the Government correctly notes that Affiant stated in the Application that Defendant told Dodson that he *had* several AR variant firearms not that those firearms *belonged* to Defendant.  [Doc. 19 at 6].  Adding to the Application Dodson's statement that Defendant claimed the AR variant firearms, which Dodson believed Defendant had modified, belonged to his brother would not impact a probable cause finding.  Even if the fact that Defendant's brother owned these firearms lessened the chance, approximately one year after the firearms were observed by Tyler Truitt and discussed with Dodson, that Defendant would still  be in possession of those illegally altered, unregistered firearms, both Defendant's nephew Tyler Truitt and Dodson related that Defendant had other firearms in his

18

residence.   For example, Tyler Truitt observed two .22 caliber pistols with suppressors, which should have been registered in order to be lawfully possessed, in Defendant's residence, as well as other assorted firearms and firearm parts, and observed a shotgun with a pistol grip in the trunk of Defendant's vehicle. (Application ¶ 24).  And Dodson related that Defendant advised him that Defendant had several short barreled rifles, with suppressors attached, which also should have been registered.  (Id. ¶ 27).  And Defendant had in his residence explosive devices, whether or not rigged to his doors to explode, as observed by Tyler Truitt and as Defendant advised Dodson - also unlawfully possessed.   (Id. ¶¶ 24, 27, 36). Defendant had not registered any firearms.[5]  (Id. ¶ 35).

And the additional facts set forth in the Application, including the Affiant's opinion based on his training and experience regarding the significance of the facts set forth in the Application, support the Magistrate Judge's finding of probable cause. The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set

---

[5]Additionally, as will be discussed *infra*, information in the Application regarding Defendant's possession of these suppressors which match those previously stolen from Mainstreet Guns (Id. ¶¶ 13-14, 30) further support the reasonable inference that Defendant's possession was unlawful and that he was responsible for the thefts.

19

forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983))(internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the search warrant, the undersigned must determine only that Magistrate Judge Vineyard had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085

20

(1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

Affiant set out in the Application the basis for believing that Defendant, who was employed with Mainstreet Guns during the relevant time period, was responsible for the theft of firearms from that store and that Defendant's ongoing possession of firearms, some of which ended up being seized from other individuals by law enforcement officials, was unlawful.  As set out in the Application, Defendant owned one firearm, a Desert Eagle model .45 caliber pistol manufactured by IWI, purchased on December 6, 2013, which was found just 150 days later when a state search warrant was executed as part of a drug investigation.  (Application ¶¶ 5, 8-9).  And Defendant admitted to being in possession in or about February-March 2014 (when he claims that it was stolen from the trunk of his vehicle) of another firearm, a Walther P99 pistol, that he had purchased from Mainstreet Guns on September 16, 2013, but had sold back to the store on October 10, 2013.  That firearm should have been in the store's inventory but was not, indicating that Defendant stole the firearm.  (Id. ¶¶ 18, 20).  This firearm was also seized by law enforcement officials, from a juvenile in Texas, on June 2, 2014, which was only a short time after Defendant admitted possessing the firearm.  (Id. ¶ 18).  In fact, as outlined in the Application, Defendant could not even

21

keep straight his stories about the firearms that he purchased or more than likely stole and were later seized by law enforcement officers.

Defendant's story to Affiant about the Walther P99 being stolen from his trunk by his nephew Tyler Truitt and his nephew's friend in February or March of 2014 conflicts with the story that he told Jenny Hornsby, one of the owners of Mainstreet Guns, just a few days earlier to explain to her the ATF trace on the IWI Products .45 caliber pistol, owned by Defendant and seized in May 2014. Defendant told Ms. Hornsby that the firearm was the one stolen from the trunk of his vehicle by a family member - not the Walther P99, which Defendant should not have had in his possession in any event. (Id. ¶¶ 17-18). And Tyler Truitt, who Affiant confirmed was in custody from November 2014 until early April 2014, when he was allegedly involved in stealing firearms from Defendant, denied the circumstances surrounding Defendant's story about the theft of any firearm from his trunk. (Id. ¶¶ 22-24).

And Dodson also observed Defendant in possession of a Walther P22, with a suppressor, in late 2013 or early 2014, which matched a firearm that Mainstreet Guns reported stolen on June 30, 2014. Suppressors capable of being used with this pistol were reported stolen on September 13, 2013. This firearm, with a suppressor, also matched one of the firearms described by Tyler Truitt as having been seen by him in

22

Defendant's residence in August or September of 2013.  (Id. ¶ 30).  These facts further support a finding that Defendant was in possession of stolen firearms and suppressors.

The information in the Application concerning firearms previously owned by Defendant, the Beretta 92, 9mm pistol, the Glock Model 23, .40 caliber pistol, and the Mossberg Model 500, 12 gauge shotgun, which were seized by law enforcement officers in 1998, 2007 and 2009 (Id. ¶ 11) - along with the seizures of firearms in 2014 also previously owned by Defendant (Id. ¶¶ 5, 7-8, 17-18, 20) - are indicative of ongoing criminal activity involving the possession of firearms, especially in the absence of any reported thefts or burglaries by the firearm owner (Id. ¶ 12).[6]

---

[6]Although Defendant attempts to discount the opinion of Affiant [Doc. 17 at 21; Doc. 31 at 2 n.1], Judge Vineyard was entitled to weigh and rely on Affiant's opinions based on his training and experience, which is extensive and specifically set forth for consideration by the issuing magistrate judge (Application ¶¶ 1, 8, 12, 15, 34, 37), regarding not only the significance of the "Time to Crime" factor (with respect to the IWI Products and the Walther P99 pistols) but also the significance of the ATF tracing multiple firearms (the firearms previously seized by law enforcement) to a single owner as an indication of criminal conduct involving firearm ownership and possession.  See United States v. Leach, 498 Fed. Appx. 915, 917 (11th Cir. 2012) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation."); United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents regarding facts are properly considered in determining probable cause); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) (same); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983) (same); and see Malone v. United States, 2013 WL 3929961, at *13 (N.D. Ala. July 29, 2013) (discussing reasonable suspicion to support seizure of U.S. mail, the court stated that officers must be permitted "to draw on their own

Defendant denied, except for the story about his nephew and friend stealing the firearms from the trunk of his vehicle, any firearm thefts or burglary of his residence. (Id. ¶ 20).

Based on all of this information, even with the challenged information stricken and the omission regarding the AR variant firearms included, the issuing magistrate judge had ample facts from which to conclude that there was a fair probability that Defendant's conduct involving the unlawful possession of firearms was an ongoing venture and that he was the individual responsible for the theft of the 54 firearms from Mainstreet Guns discovered by the June 30, 2014, inventory and of the additional three suppressors missing from inventory and reported in September 2013.  (Id. ¶¶ 13-14).  This inference is supported by the Application, even with the inclusion of the information concerning the belief of Mainstreet Guns' employees that Dodson, who had been fired, was likely responsible for the thefts.  Affiant included in the Application the facts that Dodson had been fired from the store for keeping funds he received for selling a holster and for lying to the store owner about the incident and

---

experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (quoting United States v. Arvizu, 122 S. Ct. 744, 750 (2002)) (citations and internal quotation marks omitted).

that he had been questioned by Lilburn police concerning the theft of five of the firearms. (Id. ¶ 26). This information alerted the issuing magistrate judge to reasons to question Dodson's credibility. And, in light of the facts establishing Defendant's links to the stolen weapons and his lies about how the IWI Products pistol or the Walther P99 pistol (depending on the version of the story being considered) ended up in law enforcement custody, the unsubstantiated beliefs of Dodson's co-workers about the thefts would not have caused the issuing magistrate judge to discount Dodson's information. This is especially true given the fact that much of Dodson's information about Defendant's firearm possession was corroborated by the eye-witness account of Tyler Truitt. (Id. ¶¶ 23-24).

For all of the foregoing reasons, the court finds that Defendant has not made a substantial preliminary showing to entitle him to a Franks hearing. The allegedly material, false information which Defendant contends was deliberately or recklessly included in the Application regarding the claymore mines being rigged and that Defendant was addicted to heroin were simply not essential to a finding of probable cause. See O'Ferrell, 253 F.3d at 1267 (defendant, finally, must demonstrate "that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant"). And the material

information that Defendant contends Affiant deliberately or recklessly omitted from the Application, that is, Defendant's statement to Dodson that he did not own the AR variant firearms and that Dodson's co-workers believed, because he had been fired, that he stole the firearms from Mainstreet Guns, if included in the Application would not undermine the finding of probable cause. See Owden, 345 Fed. Appx. at 454 (if the challenge is based on information omitted from the affidavit, then the showing must be that the "'omission was essential to the finding of probable cause'") (citation omitted).

### b.     Staleness-Nexus to Residence

Defendant next argues that the information in the Application for the Search Warrant did not establish probable cause to believe that evidence of crimes for which the warrant was being sought, that is, (1) receipt, possession, concealment, selling, or disposing of any stolen firearms or theft of firearms from a FFL, 18 U.S.C. §§ 922(j) and (u), (2) transferring or possessing a machine gun, 18 U.S.C. § 922(o), and (3) receiving or possessing a firearm, which includes an unregistered destructive device, 26 U.S.C. § 5861(d), would be found in October 2014 in his residence.[7]

---

[7]Defendant includes a third argument challenging probable cause based on his allegation that the Application included information irrelevant to the probable cause determination. [Doc. 17 at 20-22]. Some of the extraneous information identified by

26

(Application).[8]   Defendant contends that the most recent information in the Application as identified by him, Dodson's conversations with Defendant concerning his possession of firearms in July or August of 2013 and Tyler Truitt's observations of firearms in Defendant's residence in August or September 2013 - when considered with other allegedly stale information, that is, Defendant's possession of firearms before 2010 - does not establish probable cause that evidence of the identified criminal activity would be found in his residence when the warrant was issued.  [Doc. 17 at 16-19].  Relying in large part on Affiant's opinion based on his training and experience regarding where evidence of crimes involving firearms offenses would be found, the Government responds that, because Defendant's crimes involving firearms

---

Defendant, such as references to white supremacist organizations and the conduct of straw purchasers, may very well not be necessary to the probable cause finding, but Defendant fails to point out how inclusion of the information negates the finding of probable cause.  [Id.].  And, as will be discussed, Defendant simply fails to comprehend the significance of Defendant's past possession of weapons which were seized by law enforcement and his current allegedly unlawful conduct involving firearms.  The court will address, as necessary, Defendant's arguments in this section of his brief while discussing whether the Application establishes a nexus between the residence and the evidence of criminal activity.

[8]The court also notes that within the Application, additional unregistered firearms, the suppressors and short-barreled rifles, were identified in Defendant's possession, which would also constitute a violation of § 5861(d).  (Id. ¶¶ 13 n.3, 14, 24, 27 & n.8, n.9 & n.10, 30, 35).  And see 26 U.S.C. § 5845(a).

27

are ongoing and because the information in the Application is not stale, the Application supports finding a nexus between the evidence being sought and Defendant's residence in October 2014. [Doc. 19 at 10-15].

When the challenge raised is a lack of nexus between the place searched and the items being sought and involves the residence of a defendant, the Eleventh Circuit Court of Appeals has stated that "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'" Kapordelis, 569 F.3d at 1310 (quoting United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)). The court in Kapordelis further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime."

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)); see also United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v.

28

Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted). Therefore, while the affidavit must establish a link between the defendant and the residence to be searched as well as between the residence and criminal activity, "[t]here need not be an allegation that the illegal activity occurred at the location to be searched . . . ." Kapordelis, 569 F.3d at 1310 (citing, e.g., United States v. Anton, 546 F.3d 1355, 1358 (11th Cir. 2008) (holding that evidence establishing that a defendant possesses contraband of the type that would normally be expected to be hidden in a residence will support the search); United States v. Jenkins, 901 F.3d 1075, 1080-81 (11th Cir. 1990) (finding that nexus between the items to be seized and a defendant's residence can be established circumstantially if the contraband is capable of being hidden therein)). In this case, in addition to any reasonable inferences drawn from the information in the Application, the facts set forth in the Application establish that the alleged criminal activity, for example, unlawful possession of unregistered firearms, occurred in Defendant's residence. Defendant, however, contends that information to be stale. Accordingly, the issue before the court is whether Magistrate Judge

29

Vineyard had a "substantial basis" for concluding that probable cause existed to search the residence at the time the warrant issued.  See Gates, 103 S. Ct. at 2331.

The "staleness doctrine in the context of probable cause . . . requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000); see also United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) ("To satisfy the probable cause standard, the government 'must reveal facts that make it likely that the items being sought are in that place when the warrant issues.'") (quoting United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985)). "Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing." Harris, 20 F.3d at 450.  In deciding whether information in a warrant is stale, each case is decided "based on the unique facts presented[,]" id., and "[t]here is no particular rule or time limit for when information becomes stale[,]" Bervaldi, 226 F.3d at 1265.  "In this case-by-case determination[, a court] may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Harris, 20 F.3d at 450 (citations omitted).  And, in considering these factors,

Magistrate Judge Vineyard may rely on reasonable inferences and on Affiant's opinion drawn from the facts stated in the Application.

The criminal conduct upon which the application for the search warrant was based is not discrete but ongoing.  The historical information set forth in the Application regarding Defendant's past ownership of firearms, three of which were subsequently seized by law enforcement officers, in 1998, 2007 and 2009 (Application ¶ 11), when considered in light of the recent incidents of firearms possessed by Defendant, the IWI Products pistol and the Walther P99, being seized by law enforcement in 2014 (Id. ¶¶ 5-8, 10, 17-20), supports the reasonable inference that Defendant's illegal activity concerning firearms is ongoing.  This inference is reinforced by Affiant's opinion, based on his training and experience, that the circumstances surrounding the possession of the firearms and the subsequent seizure by law enforcement is indicative of criminal conduct.[9]  (Id. ¶¶ 8, 12).  Additionally, unlawful firearm possession, in and of itself, "is an ongoing crime, so 'old' information is relevant to the question of present probable cause."  United States v. Piloto, 562 Fed. Appx. 907, 913 (11th Cir. 2014) (noting that because "firearms are not consumable items[,] it would be reasonable to believe that [the defendant] continued

---

[9]See ftnt. 7, *supra*.

31

to possess his gun in his home for at least 13 months"); and see United States v. Goodwin, 552 Fed. Appx. 541, 545 (6th Cir. 2014) (finding that the defendant's "possession of an unregistered machine gun [is an] ongoing offense[ ]") (citing, *inter alia*, United States v. Lancaster, 145 Fed. Appx. 508, 513 (6th Cir. 2005) (in which the court held "that information regarding a defendant's possession of a machine gun over two years before the warrant issued was not stale")); United States v. Deering, 296 Fed. Appx. 894, 898 (11th Cir. 2008) ("common sense suggests that firearms . . . are generally not items that are dispersed quickly, particularly when multiple firearms are possessed in the residence for personal use").  Even if the court infers that Defendant did not keep the AR variant rifles he claimed belonged to his brother and that he was not continuing to convert other rifles in his possession, Defendant was in possession of a number of other firearms and firearm parts which probably remained in his residence and were more likely than not to be found in that location in October 2014. (Application ¶¶ 17-18, 20, 24, 27, 30-31).

And Defendant, in making his argument, ignores the information in the Application that supports the conclusion that Defendant was engaged in the theft of firearms from Mainstreet Guns, conduct probably beginning after he was hired in October 2012 and continuing at least through the date of the last inventory conducted

32

by the store on June 30, 2014.[10]  (Id. ¶¶ 5-6, 9-10, 13-15, 17-18).  Some of those stolen

firearms were seized by law enforcement authorities, another link to Defendant's

history of having firearms he owned seized by law enforcement.  The rest of the stolen

firearms, several dozen, remained unaccounted for as of the date of the execution of

the warrant.  (Id. ¶¶ 5-6, 9).  The Application provided the issuing magistrate judge

"with a reasonable basis for concluding that Defendant might keep evidence of his

crimes[, that is, the stolen firearms] at his home, i.e., a 'safe yet accessible place.'"

Kapordelis, 569 F.3d at 1310 (citation omitted).

---

[10]These facts include Defendant's possession of the Walther P99 after he had
sold the firearm back to Mainstreet Guns, Defendant's conflicting stories about the
IWI Products pistol or the Walther P99 being stolen from the trunk of his vehicle by
his nephew - a claim discounted by Tyler Truitt - to explain how weapons previously
in his possession were seized by law enforcement, Defendant's possession of the
apparently stolen Walther P22; Defendant's possession of unregistered suppressors
of the type stolen from Mainstreet Guns before September 13, 2013, and Defendant's
presence in the store, giving him access to the items, during the time period of the
thefts. (Application ¶¶ 7-8, 10, 13-14, 17-18, 20, 24, 27, 30, 35).  And Defendant was
obviously supplementing his income of $8.50 per hour at Mainstreet Guns as
evidenced by his ability to purchase, for cash, a firearm costing $2,650.00 in May
2014 through activities that he did not wish to disclose as evidenced by the fact that
he lied about the source of the funds used to obtain the weapon.  Defendant falsely
stated that the funds came from a bonus received from UPS, although he had been
fired in December 2012.  (Id. ¶ 31).

AO 72A
(Rev.8/82)

In addition to the fact that a variety of firearms, including unregistered short barreled rifles, suppressors and destructive devices, and firearm parts were observed in Defendant's residence as recently as twelve to fourteen months before the search warrant was obtained, Affiant provided his opinion that individuals who possess firearms and related packaging and other materials store those items in their homes and maintain such items for a long period of time.  (Application ¶¶ 37).  Along with drawing his own reasonable inferences regarding where firearms, including those probably stolen from Mainstreet Guns would be stored, Magistrate Judge Vineyard was entitled to rely on Affiant's opinion as to the probable location of the firearms. See United States v. Williams, 544 F.3d 683, 686-87 (6th Cir. 2008) (noting that courts "may afford 'considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found'" and finding that "the warrant application demonstrated 'continuing and related illegal firearm activity,' from which the issuing judge could infer that evidence pertaining to the handguns would be found in [the defendant's] residence") (citations omitted); United States v. Umansky, 291 Fed. Appx. 227, 228 n.1 (11th Cir. 2008) (noting that in reviewing the sufficiency of probable cause for a search warrant, the appellate court "give[s] due weight to the inferences that the judge and law enforcement officers drew from the

facts"); <u>Anton</u>, 546 F.3d at 1358 (based on the information in the affidavit for a search warrant for the defendant's residence, including that agents had observed the defendant, along with his trailer, at gun shows and had observed the defendant in possession of firearms at the gun shows, that an informant had advised that the defendant possessed over 300 guns, and that, based on the agent's experience, convicted felons and firearms dealers typically store contraband items on their property, the court found that the search warrant was supported by probable cause).

For the foregoing reasons, the court finds that, when considering the totality of the information set forth in the Application, as redacted and augmented pursuant to the <u>Franks</u>' discussion, those facts provided Magistrate Judge Vineyard with a substantial basis for concluding that there was probable cause to believe evidence and fruits of the various unlawful firearms' conduct cited in the Search Warrant would be found in Defendant's residence in October 2014. <u>See</u> <u>Gates</u>, 103 S. Ct. at 2331.

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 17] to suppress evidence be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

35

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** THIS 26TH DAY OF MARCH, 2015.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

36